Norman Smith here for the Plaintiff Appellant in Hill v. Southeastern Freight Lines. Mr. Hill was fired from his position as a truck driver at age 60 after 27 years of successful service. And the year after, having received an award for 25 years of good service from the defendant. One of the things I think that's kind of central to the case is the so-called Tommy Thompson system, this work measurement system that we keep reading about in the briefs and the appendix. If you look at the defendant's graph, which is at page 109 of the appendix. Could I also ask you, when you're in the appendix, you indicated that Mr. Hill had a record of excellent performance? That is our position, if you please, Your Honor. If you could, while you are in the appendix, point me to some reference, some support for that. Well, sure. Thank you. He received this award for 25 years of good service. The only performance evaluation that he ever received was favorable. I didn't mean to interrupt. You were looking for something else in the record. But when you are in the record, if you could point me in the record, I had some difficulty locating some of your record sites. Well, I understand that some of the record sites may have gotten garbled in the brief, and I'm sorry about that. But all the record sites in our brief are to the affidavit and its exhibits, that is Mr. Hill's affidavit. Thank you. But anyway, what I was going to look at, if I could, if it pleases the Court, is this. On page 109 of the appendix, there is a graph which the defendant prepared based on this work measurement system. And the thing that, to me, is very, very telling is that, and this is using the defendant's own graph, this is not our work, this is the defendant's work. When you track for the last year, and it all ends in June of 2010, it all ends then, even though, but anyway, when you track for that last year, you find that Guthrie, a much younger employee, and my client have the same scores, just the same. In fact, my client may be a tiny bit better than Guthrie. But in any event, my client gets fired, and Guthrie, as far as we know, doesn't get warned, doesn't get counseled, doesn't get reprimanded, certainly doesn't get fired. And the problem with the grading system is that it favors drivers who drive long mileage and have lots of drops and pickups. And my client's route was local with low mileage and had no drops and pickups, so it was a system that was not favorable to him. And when other drivers were assigned my client's route, their scores were similar to those of my client. So we believe that this was a pretextual basis that the defendant seized upon. Let me ask you, if I could, a more fundamental question. Sure. One of the elements that is the plaintiff's burden to prove in cases of this type is that the position that the plaintiff had remained open or was filled by some similarly qualified individual who was younger than him. And that particular element of the case doesn't appear to me to have been pled in your complaint, nor could I find any evidence proffered by you in the course of this proceeding. And the district court used that as one of its bases to render its ruling that not only was it a failure to plead, but a failure to prove. And if that be the case, how can you prevail here? Well, Your Honor, in the first place, I don't think it's a pleadings case, because we're at summary judgment. It's really a proof case. But the fourth element, we believe, is satisfied in two different respects, as we discussed in our brief. And also keep in mind that the fourth element— Why don't you tell us what those are? Yes. On the one hand, my client's position, that is, of serving these key customers—Lowe's, Home Depot, others—had to have been handled by somebody else after he was dismissed. In other words, somebody had to be put into that position in order for a defendant to serve these key accounts. That's clear. I don't know who that person was, but that position remained open long enough to be filled. I mean, is that something you've just arrived at and expect the court to accept as a matter of deductive reasoning, or do you have some proof that you put before the court? Well, it's a simple matter of logic and reasoning and common sense. And, of course, we're told over and over again by the Supreme Court that the prima facie case elements are not onerous, and also that they're flexible. And that when they fall into particular patterns that we repeat and repeat, those patterns don't necessarily govern each and every case that comes along. And to answer Your Honor's question further, the second way in which we satisfy the fourth prima facie element is to show that there were open positions on the dock that my client could have filled. He knew how to do dock work. He had done dock work. He went to the dock every day. He knew that there were two or three positions open at the very time he was let go. But that wasn't his position. I'm sorry? That wasn't his position. No, but that's a position he could fill. How does that help you, though, prove your prima facie case? Because the contents of the fourth element are flexible. And when you have someone who is eliminated but there are equally available positions that he's fully capable of filling, those positions can be included within the analysis for the purpose of the fourth element. This is not a reduction in force case. I beg your pardon? This is not a reduction in force case. This is termination. This is not a reduction in force case. It's a termination, isn't it? This is a termination case. This is a termination case, allegedly. For cause. Allegedly for cause. And you're saying that we're supposed to apply common sense that his position was filled by? Not filled? Was it not filled? His position had to be filled. These customers had to be served. We can take judicial notice that a business that we have no idea how it's run, we can take judicial notice that they had to fill his position? Not judicial notice, but simply. What do we take? You're not giving us two of those in the record. Where do we get it from? Because it stands to reason that these customers had to be served and that someone had to be driving this run. This run number 10 was a critical part of the defendant's operation. Or maybe the customer, for example, decided not to use the company anymore after they were dissatisfied with his services. How would we know? I'm sorry. I didn't catch your order. Well, in the facts, remember one customer complained about his being late in how he handled their delivery. Do you recall that in the record? Yes, I know about that. How do we know that that customer didn't say, well, I'm going to another company completely? Because you urged that common sense would tell us the answer that I thought you were to give us. Well, to me, if you please, Your Honor, it's very clear that these customers continued to be served and that somebody was assigned to serve them, and that meant that his position was open for minutes or hours and refilled by another driver. If I could go back a step further. You first have to show, do you not, that Mr. Hill was performing satisfactorily. That is correct under Fourth Circuit. If I may, I'm not finished with my question, if you don't mind. With respect to Mr. Hill's performance, on February 25th, 2010, he had a record of negative comments about his performance. And on February 25th, he signed a statement informing him that this is a final correction concerning your performance. Any future violation of company policy, practice, safety rules, or guidelines will result in additional disciplinary action, including termination. Correct? Your Honor, I'm inclined to believe that you are reading correctly from certain pages of the appendix, but I would caution the Court that there are a number of pages of alleged disciplinary record. Yes, there are. That were not in any way authenticated and not in any way shown to have been applicable to the client. These are deposition exhibits. Who has to show a prima facie case? I have to show a prima facie case, and I have to try to overcome every claim of legitimate business reasons that is forwarded by the defendant. I've done so. I've gone to the Marty Coleman affidavit, and each and every thing that they have suggested was a reason, I have been able to demonstrate is not. But we're in agreement that on February 25th, Mr. Hill signed that statement. Your Honor, what you're looking at, if it pleases the Court, are a series of things that are in appendix 74 to 107. These are simply deposition exhibits. The deposition transcript that precedes them does not... Is it your position that Mr. Hill did not sign that statement? Your Honor, my position is that that is not evidence that the Court could have considered because it's not authenticated in any way. I neither admit nor deny that particular thing. I've dealt with their allegations that are probative, which are those set forth in the Coleman affidavit. The things that Your Honor is looking at, and I think the district court looked at them too, are in no way authenticated by the deposition testimony that precedes them. The only exhibits that are referred to in the deposition testimony are five and six, which have to do with the eye problem. So, you know, I can't stand up here and say, oh, I admit this and that, because they're not a part of the record that has been authenticated and has been established factually. We went by the Coleman affidavit and point by point by point by point refuted the things that were alleged there or claimed there to have been improper conduct on the part of my client. You know, looking at the cases in this circuit, we think we fall very clearly on the side of the line that's favorable to us and unfavorable to the other side. For example, in the Hux case, the plaintiff dealt with only one evaluative factor, whereas the defendant relied on multiple factors. Here we dealt with every factor that the defendant put in its affidavits. In Anderson, cited in Hux at page 3- In short, your client put in a retort to I'm not doing a good job because he said he is doing a good job, correct? Is that long and short of what you're saying? No, I'm not saying that my client was just giving an opinion that he was doing a good job. He was citing all kinds of objective evidence to the effect that he was. Such as? Well, such as the defendant's statements, don't worry about these occasional evaluative things. They're meant to be constructive. They're in no way threatening your job. The defendant gives him a 25-year service award. He gets accolades from the customers. Are those in the record? I'm sorry? Are those in the record? Sure, they are. They're attachments to the affidavit of Mr. Hill. Yeah, but the problem is he had 25 years of service award, but he worked 27. He received the 25-year award the year before. Right, so the last year after that, right? And this is the year following his receipt of that award. He received it in 2009, and he's fired in 10. I see my time is essentially gone. I was going to lead the court through a number of these cases showing that we had refuted each and every allegation of inadequacy that had been made against us, where in those other cases which the plaintiff lost, those inadequacies were not properly addressed, and those in which the plaintiff won on appeal, they fall on our side of the case. And so we think when you balance those two lines of cases together that this case has to be reversed. Well, thank you very much, and I've reserved a little time, and I'm glad to deal with other issues when I'm coming back up. Thank you, Mr. Smith. Is it Duda? Duda. Duda? Yes, there you are, Mr. Duda. May it please the court, my name is Bill Duda. I'm here on behalf of Appalachee Southeastern Freight Lines. Rather than delve directly into walking through the prima facie case and the way in which the district court below is correct in its application and its analysis of the facts, I do want to point to a couple of things that came up in your questioning of Mr. Hill's counsel. As to his claim that the February write-up that was a final written was not authenticated and offhandedly discarding it as just a deposition exhibit, I would point you to appendix page 53, which is page 89, an excerpt from Mr. Hill's deposition in which he was specifically questioned about the document. Not only did he acknowledge his receipt of it on that page, he also acknowledged that it was different than the other ten write-ups he had received at that point. Going back to 2007, up and through March the 3rd of 2010, he received a grand total of 12 write-ups. The February one, which was a final written, he acknowledged in his deposition testimony looked different from the others because it included language suggesting that were there to be further violations of company policy or continued problems with his performance, that in fact he would likely be terminated. The other warnings came with much more loosely fitting, may result kind of language. So there's simply no basis to suggest either that it was unauthenticated or that it didn't hold a particular import from Mr. Hill when it was presented to him by my client. Mr. Duda, you know it's full circuit pressure. It's very difficult to meet the challenge of saying you're not doing a good job in the eyes of your employer by saying I'm doing a good job. But what do we have to do with his circumstances? He was there 25 years and he was stellar, an award-winning employee. Then all of a sudden he gets this rash of it. He said 12 write-ups and he's 60 years old. Is this a coincidence or what is it? No, absolutely no coincidence, Your Honor. What I would suggest to you is if you look at his history, number one, his performance had been an issue for him, particularly the speed with which he performed under the Tommy Thompson system, the proprietary system specifically designed for my client that the plaintiff admits they had relied on for 20 years, that my client testified they had relied on for 20 years, and quite frankly the law in this circuit is he's in no position to question, nor would the court in its position question the rightness of whether or not that's the appropriate system. If it were meant to cover up some discrimination, then maybe it would be. But his performance goes back to 1990, and this evaluation that he says was beautiful and wonderful on all fronts, quite frankly it wasn't. I do want to point you to that particular, the evidence that they rely on for that piece of testimony is an evaluation that was given to him in 1990, which is at appendix pages 163 and 164. Those are attached to his affidavit. I would point you, however, to appendix pages 80 and 81, which are the two pages of that evaluation that he left off. Both of those pages indicate two things, that at the time, even in 1990, he was moving a little slower than they would have preferred, and that a particular number, 101.5, was not performance that was good enough back then. And back then in 1990, they worked with him and worked with him and had similar kind of write-ups until 2003, and this is all in the record. From about 2003 to 2007, Mr. Hill is clean, in terms of his write-ups, disciplinary action, and whatnot. But these 12 write-ups don't come over a terribly compressed time frame, they come over three years, six of which dealt with how fast he did his work. The other six dealt with things like not taking out the proper equipment, not making a correct delivery, and things of this nature. And so they continue to work with him throughout these three years, trying to get him, quite frankly, to bump his performance up. You know, Mr. Smith claims that this route he was on was why his numbers were lower, but quite frankly, there's evidence in the record through these performance evaluations, these corrective actions, that when we sent drivers into his area, areas that he would be more familiar with, they outperformed him on his numbers. So that indicates that it's not the route, it's the driver, secondarily to that. During this process, in this 2007 to 2010 period, we sent out drivers with him in what are called check rides. That's to see how the driver's doing to address things they maybe could do better and things of this nature. Lo and behold, on these check rides, Mr. Hill was able to hit the kind of numbers we wanted him to during this time frame in question. But when left to his own devices, and when he was out there without supervision, his numbers went back down to the levels that were unacceptable. Are you suggesting this suggests he was malingering? I'm not suggesting malingering. I'm suggesting that when there's a cop on the side of the road, people tend to speed less. And that principle applies here with Mr. Hill. When he was under scrutiny, he tended to do his job a little better than when he didn't have scrutiny. Immediately, they are sitting with him in the cab. But as to the suggestion, which is ultimately the issue in this case, which is, is this somehow age-biased because this gentleman was 60 years old at the time some of these things were coming on, I would point you to a few things. Number one, they didn't do anything quick with him. They certainly gave him a whole lot of chances, told him very clearly and explicitly what they expected. That would be number one. Number two, there's another driver at this particular location where Mr. Hill worked who is two years older than he is, who's meeting his numbers in the same P&D driver route. He continues to work there as far as I know today. So to the extent there's any suggestion age was the issue, that's not it. Secondarily, when they met with him and said on this May 10th incident, which is an incident that, again, he takes a different position, he says he was doing fine, my client's testimony is, and Plaintiff even speaks to this in his deposition, the comment my client made, his supervisor Marty Coleman made to him on May 10th, was, all morning you made four stops? Now you can debate whether or not he should have made four stops, whether circumstances were such that he should have made four stops or more, but quite frankly my client legitimately held a belief that he was too slow that morning and that created a customer issue. So that was the straw that broke the camel's back for my client. He had been put on a final written warning from all these corrective actions, and that morning with that customer, another complaint came through about how quickly we got something done, and they said we're not going to continue to do this with you, Mr. Hill. But they didn't fire him. They didn't fire him right then. They suspended him and thought about what they were going to do with him. What they turned around to do at that point is they talked to HR, based up in South Carolina, and they make a decision. Let's offer him another job, a different job. The legitimacy of what they did is indicative by the job that they offered him. The job they offered him specifically would remove from him the problem he was having in his P&D driver job. Now a P&D driver is a pickup delivery driver. You're riding around town, you're stopping, getting in and out of your truck, and doing it to a lot of places. He, quite frankly, just wasn't fast enough at that. The job that they offered him was a line haul job, which means you get in a trailer and you drive it down there, you drop off the trailer and you drive your truck back with or without another trailer. It's a straight shot. But he responds that it required him to drive at night and he had glaucoma. Sure. As to that point, very quickly, one, this was also an ADA case when it came through by the lower court. Yes, that was not appealed, I believe. We had no idea, and that's what the record reflects, and I think there's even actually some deposition testimony to that effect. We didn't know he had any condition. It was an unknown condition to us at the time, and quite frankly that's probably why that part of the case wasn't appealed. There's no basis we knew when we said let's give him a line haul job that requires him to drive at night that I will get him because we know really he can't do that. Not only did we not know it, it's legitimized by the fact that one year prior to the time they made this decision to offer Mr. Hill this job, they had done exactly the same thing with another driver who was 39 years old. He had come in as a PD and P&D driver, pickup and delivery driver like Mr. Hill, and his performance was inadequate, and they even moved quicker with him. They said this isn't going to work out for you. We've spent time and money invested in you. We've got another position that might work. How about you take a line haul job? That worked for him. He continued to be employed, and that would be the best result for everybody. So when it came to Mr. Hill, we were faced with a very similar circumstance in terms of a driver who, in his case even more so, had been with us for a long time, and we recognized his tenure. I don't even know that we had a particular need for a line haul driver, but we were willing to put him in that position in order to continue to employ him. What we were not willing to do at that point was continue to allow his lower performance to continue as a P&D driver, and so they offered him that position, unbeknownst to the fact that he had an eye condition that would limit his ability to drive at night. And when he told us that, we had no other available positions, and that's in Mr. Coleman's affidavit. At that point, the decision was made to terminate his employment rather than allow him to go back to the P&D driver position in which his performance was notably, and over a long-standing time, inadequate. So when it comes to the basis for the district court's decision in which all these facts are pushed into the law and extrapolated out, he wasn't meeting our legitimate expectations of that P&D driver position at the time. His numbers had been bad. They had been bad for a while, and we had had enough. And like the Warch case, which quite frankly is incredibly analogous factually and legally to what we're discussing here today, after a long period of time, we're permitted to say we've had enough of substandard performance and we need to make a change. That's what we did here. He's got the burden to prove that he was meeting our expectations. We've provided thorough record evidence suggesting that he was not. As to the fourth prong, you all hit the nail on the head, and it's a point we made in our brief. There's simply no evidence of either that position being filled or if you even want to give him the deference of saying that that's such great logic that we can assume somebody filled it. How old were they? That's still an unanswered question, and quite frankly, it doesn't matter if it was just filled. If it's just opened, that matters. But if it's filled, as he suggests you conclude from logic, you have to know the age of the person who fills it in order for that to be meaningful at all to you. And absent any evidence on that point, he necessarily fails the fourth prong of the promulgation case. So whether or not it's three or four, the result's the same that he fails to meet the promulgation case. I think we understand your position. Anything further? If you do not have any further questions for me, I have nothing else to present. Thank you, Mr. Duda. Thank you. Mr. Smith, you have some time. May it please the Court, I would emphasize that this so-called final warning was exactly two months before discharge. Can you move a little closer to that, Mike? I'm having difficulty here. The so-called final warning was exactly two months before the event that led to the discharge and thus we believe was part of the, at that time, had become part of the plan to get rid of this employee. Remember that his performance was just as good as the younger employee, Guthrie, even though Guthrie had a better route that you could earn better points on. And remember also paragraph 7 of Plaintiff's Affidavit, Appendix 130, that plaintiff's numbers were the same as those of others assigned to his route. So when others got assigned to his route, his numbers and their numbers were just as good. So this work measurement evidence that the defendant keeps trumpeting simply does not support its position. With regard to the dock worker's job as an alternative, my client did ask for that and those positions were available. He has said that under oath. He knows that. He was on the dock every day. Let me, if I may, just spend a moment or two looking at the events of May 10, the so-called straw that broke the camel's back, and if there was ever pretext, it certainly can be found in the facts of that incident. Okay, my client arrives at work at 9.30 as scheduled. He was due in there at 9.30. He got there at 9.30. Walter Kitty, the customer, had called in at 8, an hour and a half earlier, and said, we need two trucks right away to pick up goods at our company. My client didn't know about that, but the dispatcher and his supervisor did. So my client makes his other deliveries, three other deliveries, which involved a lot of unloading and a lot of siting in warehouses and so forth, and he gets to Walter Kitty, as expected, about 12.30. So that's 4 1⁄2 hours after Walter Kitty has called the defendant saying, I need trucks right away. And Kitty tells my client about this pickup request and said, I haven't gotten the trucks that I called for. Here you are, 4 1⁄2 hours later. So my client immediately calls the dispatcher and supervisor. The dispatcher and supervisor says, go ahead, deliver your other freight first. Go to your other customers, finish that, then come back and load Kitty's stuff. So how is that, I would ask. How is that some fault on the part of my client? I can't see it. That's the straw that broke the camel's back. If anything was ever pretextual, that certainly is. So we believe, Your Honors, and we're very confident that we fall on the right side of the precedence in this circuit, even when using the promissacy elements that this circuit defines them to be. Those cases that were lost are cases in which the plaintiff failed to deal with one or more material criticisms that had been established in the record by the defendant, whereas we dealt with every single one of them that were in the Marty Coleman affidavit. On the other hand, in the Bass case and the Dugan case, cases that we rely on, in Bass you had promotion pay increases and told that the work was satisfactory. That was enough to get him past all the criticisms and to take his case to the jury. In Dugan, the plaintiff offered some evidence of satisfying the defendant's job requirements, and that was enough. I know that at five different places in the brief, defendant says, oh, the plaintiff admitted that if he'd made the right figures under the Tommy Thompson system, he would have still been there. He just said, I probably would have, but I think what he was saying is that if I'd have been treated right and hadn't been fired unjustifiably, I'd still be there. But in any event, his speculation is irrelevant and not material. And why a defendant should choose to repeat that five times only, to me, reinforces the weakness of its overall position. Well, I see my time is essentially gone. If there are no further questions by the court, I will stand aside. Thank you very much. Thank you very much, Mr. Smith. We're going to ask the deputy to announce a brief, very brief, I may add, recess, and then I want to come down and greet counsel. And while we're gone, I invite those standing, please come down and fill the seats in up front. We'll come down and greet counsel.
judges: Roger L. Gregory, Allyson K. Duncan, G. Steven Agee